R. Bruce Rich
Benjamin E. Marks
Jason Lichter
WEIL, GOTSHAL & MANGES LLP
767 Fifth Ave.
New York, NY 10153
(212) 310-8000

**09 CV 10366**

RECEIVED
DEC 21 2009
U.S.D.C. S.D. N.Y.
CASHIERS

Attorneys for Applicants
WPIX, Inc., et al.,

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

WPIX, Inc., et al.,

                Applicants,

      -against-

BROADCAST MUSIC, INC.

              Respondent.

--------------------------------------------------------x

09 Civ. _____ (LLS)

*Related to United States v. Broadcast Music, Inc., 64 Civ. 3787 (LLS)*

**WPIX, INC., ET AL.'S PETITION FOR DETERMINATION OF REASONABLE LICENSE FEES FOR LOCAL TELEVISION STATIONS**

    1.    The owners of approximately 1,200 local television stations ("Applicants"), by their attorneys, Weil, Gotshal & Manges LLP, hereby seek an order from the Court, pursuant to Article XIV(A) of the BMI consent decree, setting reasonable fees and terms for blanket and per program licenses authorizing, on a through-to-the-viewer basis, performances of music in the BMI repertory in programming that is transmitted by or through Applicants, whether broadcast on Applicants' local television stations, streamed on station-affiliated web sites, or delivered as part of programming supplied by Applicants via mobile, wireless and other digital platforms. The licenses requested herein do not seek coverage for those performances already covered by through-to-the-viewer licenses held by the ABC Television Network, the CBS Television

Network, the NBC Television Network, and the Univision Television Network for their network programming ("Licensed Network Programming").

2.    This Petition covers performances of BMI repertory music in Applicants' programming (other than Licensed Network Programming) in the United States between January 1, 2005, and December 31, 2014.   The parties' previous fee agreements expired December 31, 2004.   Since that time, Applicants have continued to pay, on an interim basis, blanket and per program license fees in accordance with the terms of the expired agreements applicable to the most recent year of those agreements.

3.    Since the last voluntary final fee agreement between BMI and Applicants was reached in 2002, the economic health of the local television industry has deteriorated profoundly. Moreover, experience has shown that the per program license alternative to the BMI blanket license is unreasonably expensive for the typical station and the access it affords to competitive markets for music performance rights is far too limited.   By this Petition, Applicants seek: (i) a significant reduction in annual blanket license fees to reflect Applicants' changed economic circumstances; (ii) for the period commencing January 1, 2010, an adjustable credit to, or "carve-out" from, blanket license fees for performances of BMI-affiliated compositions by Applicants that are licensed to them by other means, such as by the copyright owners directly or through the suppliers of the programming that Applicants deliver; (iii) adjustments to those aspects of the per program license that make it unreasonably expensive for the typical station; and (iv) access to information about the presence of BMI repertory music in programming broadcast on local television that is maintained by BMI in the ordinary course of its business but currently withheld from Applicants, their agents, and their representatives.

4.    Pursuant to the Order of Judge Stanton dated April 25, 2001 in United States v. Broadcast Music, Inc., 64 Civ. 3787, Applicants bring this proceeding by separate petition and note that this proceeding is related to 64 Civ. 3787.

### The Parties

5.    WPIX, Inc. joins owners of approximately 1,200 other full-power local commercial broadcast television stations operating in the United States as Applicants in this ratemaking proceeding.   A list of the stations owned by Applicants is attached as Exhibit A to this Petition.   In addition to over-the-air broadcasting, Applicants also offer programming to consumers via individual station web sites and various other "new media" platforms capable of displaying and disseminating audio-visual programming.

6.    Respondent BMI is a music performing rights licensing organization, with its headquarters at 320 West 57th Street, New York, NY 10019.   BMI is a New York corporation that operates on a non-profit basis.

### Jurisdiction

7.    Jurisdiction is proper in this Court pursuant to the Court's rate-setting authority under Article XIV of the BMI Consent Decree.   United States v. Broadcast Music, Inc., 1966 Trade Cas. (CCH) ¶ 71,941 (S.D.N.Y. 1996), as amended by 1996-1 Trade Cas. (CCH) ¶ 71,378 (S.D.N.Y. 1994) (the "BMI Consent Decree").

8.    Pursuant to Article XIV of the BMI Consent Decree, the Court has jurisdiction over the instant Petition because: (i) Applicants have requested license fee quotations pursuant to Article XIV of the BMI Consent Decree; (ii) BMI has advised Applicants of the fees it deems reasonable for at least certain of the licenses requested; and (iii) more than 90 days have passed since BMI advised Applicants of the fees it deemed reasonable, and BMI has not made a filing in this Court seeking determination of reasonable fees.

## Prior Dealings Between the Parties

9.     Applicants have been BMI licensees either for decades or, for newer Applicants, for as long as they have owned and operated local television stations.   Their licenses with BMI, with BMI's consent, have been negotiated through the Television Music License Committee ("TMLC"), an industry association that negotiates music performing rights licenses with ASCAP and BMI on behalf of virtually all full-power local commercial broadcast television stations.

10.     The most recent agreement between BMI and the TMLC covered the period from April 1, 1999 to December 31, 2004 (the "1999-2004 Agreement").   The 1999-2004 Agreement established an industry-wide BMI blanket license fee of $229.25 million for the period April 1, 1999 through December 31, 2001 (or approximately $83 million per year on an annualized basis), and $85 million per year for the ensuing three years, 2002-2004, for a total of over $484 million.   The industry-wide blanket license fees were allocated to individual stations by the TMLC, according to a methodology incorporated into the 1999-2004 Agreement.

11.     The 1999-2004 Agreement also established a per program license that afforded stations that opted for that license an opportunity to reduce the fees owed to BMI by eliminating the use of BMI repertory music from some of the programs they broadcast or by licensing such music directly from copyright owners or through the suppliers of the programming they broadcast.   Hundreds of stations have operated under BMI per program licenses, rather than blanket licenses.   Because of their efforts to "clear" BMI-affiliated music in their programming, and notwithstanding the flaws in that license that Applicants seek to remedy through this proceeding, the per program license alternative has resulted in a lowering of net fees paid by the local television industry to BMI substantially below their nominal blanket license levels.

12.    Since the previous licenses expired at the end of 2004, the TMLC and BMI have engaged in periodic negotiations on new license terms.   During the pendency of these negotiations, Applicants agreed to pay BMI, on an interim basis, pursuant to the industry-wide fees and terms applicable for 2004, the final year of the parties' prior agreement, with the TMLC re-allocating those industry-wide fees each year to individual stations.

13.    Despite good-faith efforts by each side, the parties have been unable to reach an agreement on fees, necessitating the filing of this Petition.

## Changed Circumstances

14.    Since the last voluntary final fee blanket and per program license agreements between Applicants and BMI were reached, the local television industry has experienced significant change, including, of central relevance here, a massive reduction in the size of the audience viewing Applicants' broadcast programming.   That audience decline has continued year after year, as large numbers of viewers have shifted to cable programming and various other media for news and entertainment.   This reality has brought with it a concomitant reduction in the value of public performances of BMI music being made by Applicants, as fewer viewers are being exposed to any given musical work contained in Applicants' programming.   Upon information and belief, the marked decline in the audience for Applicants' performances of BMI repertory music has not been offset by any corresponding increase in the overall amount of such music utilized in Applicants' programming.

15.    As audience has declined, so too has the ability of Applicants to generate advertising revenues, the staple of their businesses.   Applicants have been forced to reduce budgets and contain costs across the board.   An important component of these costs is the Applicants' music performance fees, which should not be exempt from the impact of current

economic conditions.   A perpetuation of the expired license fees for the time period

encompassed by this proceeding would dramatically overstate the value of performances of BMI

repertory music to the local television industry in the current environment.

16.    In addition, experience under the BMI per program license has shown that its

overall price structure, as well as its "incidental and ambient use" and administrative fee

components, in combination have made this license form unreasonably expensive for the typical

station and in need of revision to assure, as Article VIII(B) of the BMI Consent Decree provides,

"that there will be no frustration of the purpose of this section to afford broadcasters alternative

bases of license compensation."

17.    Since the time of the last negotiated licenses, the BMI Consent Decree has been

authoritatively construed to afford users so requesting, a blanket license the fee for which adjusts

to reflect the users' clearances of individual BMI works through alternative license

arrangements, whether through licenses secured directly from the copyright owners, through

suppliers of the programming that Applicants deliver, or otherwise.   In accordance with that

decree-guaranteed entitlement, Applicants hereby seek, effective January 1, 2010, a reasonable

blanket "carve-out" license.

### Relief/Determination Requested

18.    Wherefore, Applicants respectfully request that that the Court:

(a)    determine reasonable final annual blanket license fees for the period

January 1, 2005 to December 31, 2014, with a "carve-out" mechanism that, for the period

commencing January 1, 2010, will provide credits to blanket licensees for performances

of BMI-affiliated music that Applicants license through other means;

(b)    determine reasonable final per program license fees and terms for the period January 1, 2005 to December 31, 2014; and

(c)    in order to facilitate efficient per program administration, promote greater transparency with respect to the presence of BMI repertory music in programming broadcast on local television, and minimize unnecessary disputes about the presence and amount of BMI repertory music in Applicants' programming, require BMI, upon request by Applicants, their agents, or their representatives, to share music cue sheets in its possession that reflect the presence of BMI repertory music in programs broadcast by Applicants (other than programs produced by the Applicants themselves).

New York, New York
December 21, 2009

R. Bruce Rich (RR 0313)
Benjamin E. Marks (BM 0796)
Jason Lichter (JL 8564)
WEIL GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
(212) 310-8000

*Attorneys for Applicants*
*WPIX, Inc., et al.*