Michael E. Salzman
James C. Fitzpatrick
Margaret J. Hoag
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004
(212) 837-6000
salzman@hugheshubbard.com
fitzpat@hugheshubbard.com
hoag@hugheshubbard.com

Attorneys for Broadcast Music, Inc.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                    :
WPIX, Inc., *et al.*,                               :
                                                    :
                              Applicants,           : 09 Civ. 10366 (LLS)
                                                    :
             -against-                              : Related to *United States v. Broadcast*
                                                    : *Music, Inc.*, 64 Civ. 3787 (LLS)
BROADCAST MUSIC, INC.,                              :
                                                    :
                              Respondent.           :
- - - - - - - - - - - - - - - - - - - - - - - - - - x

### RESPONSE OF BROADCAST MUSIC, INC. TO PETITION OF WPIX, INC., ET AL.

Broadcast Music. Inc. ("BMI") submits this response to the Petition of WPIX, Inc., *et al.* ("the Local TV Stations") for Determination of Reasonable License Fees for Local Television Stations, dated December 21, 2009 (the "Petition").

### Scope of This Proceeding

1. BMI agrees with the Local TV Stations that the parties have engaged in negotiations regarding the final rates and terms of blanket and per program licenses for the performances of BMI-repertoire music transmitted by and through the Local TV Stations in

the United States for the period beginning January 1, 2005, streamed on the Local TV Stations' affiliated websites, or delivered in association with the Local TV Stations' mobile, wireless and other digital platforms. BMI has negotiated for five years with the Local TV Stations' joint negotiating agent, the Television Music License Committee ("TMLC"), to determine final blanket and per program rates and terms, but the parties have not been able to reach an agreement. BMI also agrees with the Local TV Stations that it is now timely, under Section XIV of the BMI Consent Decree,[1] for this Court to determine reasonable rates and terms for those licenses, and that this Court has jurisdiction to do so.

2. BMI also agrees that upon expiration of the parties' previous license agreements on December 31, 2004, and continuing to the present date, the Local TV Stations have been paying BMI blanket license fee payments on an interim basis, at the same rate they paid to BMI in December 2004, under the prior final license agreements.[2]

3. BMI further agrees that the licenses in issue should cover all the broadcast programming of the Local TV Stations, except for the network programming they carry from the ABC Television Network, the CBS Television Network, the NBC Television Network and the Univision Television Network. Thus, the licenses at issue include not only programming originated by the Local TV Stations, but also the network programming of the Fox Television Network, the CW Television Network (as successor to the WB Television

---

1. *United States v. Broad. Music, Inc.*, 1966 Trade Cases (CCH) ¶ 71,941 (S.D.N.Y. 1966), *amended by* 1996-1 Trade Cases ¶ 71,378 (S.D.N.Y. 1994).

2. The Court entered an Order on consent dated August 1, 2005 for interim fees for the period January 1, 2005 through June 30, 2006 and an Order on consent dated October 16, 2006 for interim fees for the period July 1, 2006 until voluntary agreement of the parties or final determination by the Court of a reasonable final fee. *Broadcast Music, Inc. v. WPIX, Inc., et al.*, 05 Civ. 6501 (LLS), Interim Fee Order on Consent (S.D.N.Y. Aug. 1, 2005); *Broadcast Music, Inc. v. WPIX, Inc., et al.*, 05 Civ. 6501 (LLS), Interim Fee Order No. 2 on Consent (S.D.N.Y. Oct. 16, 2006).

Network and the UPN Television Network), MyNetwork TV, and other networks carried by the Local TV Stations affiliated with (or owned in common with) those networks.

4.  However, BMI disagrees with the Local TV Stations' asserted entitlement to "a significant reduction in annual blanket license fees" and their assertion that the form of per program license the Local TV Stations agreed to in 1999 has become "unreasonably expensive." To the contrary, BMI is entitled to an increase over rates that were set in 1999. Further, BMI disagrees with the Local TV Stations' demand for Court-ordered access to BMI's proprietary cue sheet database.

## **The Parties**

5.  BMI is a music performing rights licensing organization that operates on a non-profit-making basis. BMI issues non-exclusive licenses to users of copyrighted music, collects license fees from them, and distributes royalties to its affiliated songwriters, composers, and music publishers. BMI's more than 400,000 affiliated songwriters, composers, and music publishers have granted BMI the non-exclusive right to license the non-dramatic public performing right (Section 106(4) of the Copyright Act, 17 U.S.C. § 106(4)) in their more than 6.5 million copyrighted musical works.

6.  The Local TV Stations include WPIX, Inc. and about 1,200 other local commercial broadcast television stations operating in the United States. This group comprises virtually the entire local commercial television industry within the United States, except for certain Univision-owned and Entravision-owned Spanish language stations. The industry's total revenue, in the recession year of 2009, is estimated at over $20 billion.[3] The

---

3. SNL Kagan, *Media Trends 2009* at p. 24 (2009), available by subscription at http://www.snl.com/sectors/Media-Communications/Datasets/Media-Trends.aspx; SNL Kagan, *Peer Analysis – Kagan's On-Line Application*, available by subscription at http://www.snl.com/interactivex/templatebrowser.aspx (data pulled on 2/12/2010).

3

TMLC has its own professional, full-time staff, and the Local TV Stations negotiate with BMI solely through the TMLC and its counsel. As a result, the TMLC has bargaining power and resources greater than BMI's.

### History of Negotiations Between BMI and the Local TV Stations

7.  Over the decades, BMI has periodically negotiated multi-year blanket license forms of agreements with the TMLC and license fees under those agreements were calculated historically as a percentage of revenue. Starting in the mid-1990s, at the insistence of the TMLC, BMI agreed to calculate fees as industry-wide lump-sum, or "flat", dollar amounts, paid in monthly installments by the individual stations based on an allocation devised by the TMLC.

8.  The most recent agreement between TMLC and BMI covered the period April 1, 1999 through December 31, 2004 (the "1999 License"). Under the 1999 License, the Local TV Stations and BMI agreed to both an industry-wide, $85 million per-year blanket license fee and a per program license form of agreement that the Local TV Stations could elect at their option.

9.  Before the 1999 License expired at the end of 2004, BMI and the TMLC began corresponding, meeting, and negotiating for a new license agreement to take effect in 2005. Commencing January 1, 2005 and continuing to the present date, the Local TV Stations have made monthly license fee payments on an interim basis, at the same blanket license rate as they paid to BMI in December 2004, under the 1999 License.[4] Negotiations continued up until the time the Local TV Stations filed the present Petition.

---

4.  Pursuant to Section XIV(B) of the BMI Consent Decree, the interim fees paid are subject to retroactive adjustment back to January 1, 2005 when this Court makes final fee determinations in this proceeding.

4

## Reasonable License Fees and Terms

### *The Blanket License*

10.     BMI expects the evidence to show that BMI is entitled to a substantial increase in the annual blanket license fee that the Local TV Stations should pay for the years 2005 through 2014, and that the "significant reduction" in fees sought by the Local TV Stations – both for the blanket license and per program license – is not warranted.  BMI is entitled to the fee increase for at least these reasons, described in more detail below: (1) benchmarks suggested by license fees the Local TV Stations have been paying ASCAP and SESAC for the 2004-2009 period; (2) the Local TV Stations' newly significant sources of revenues from "retransmission consent" payments; (3) the increased importance of music in the Local TV Stations' programming – and their increased reliance upon BMI-repertoire music; (4) the TMLC's desire for an expanded scope of the license that would permit Local TV Stations to use BMI music through Internet, wireless and digital transmissions; (5) the Local TV Stations' addition of broadcasts through High Definition ("HDTV") and/or digital broadcasting, further increasing the number of BMI music performances; and (6) inflation.

11.     The final license agreement the Local TV Stations entered into with ASCAP for the period from 2004 through the end of 2009, and the license fees the Local TV Stations have been paying SESAC, suggest benchmarks that justify blanket license rates considerably higher than the interim fees they have been paying BMI.  First, the Local TV Stations' ASCAP blanket license fee has risen from $85 million per year in 2004 to $94.7 million per year in 2009 – as compared to the static $85 million per year BMI blanket license fee – despite the fact that BMI's music is more widely used by Local TV Stations than ASCAP's music.  In November 2008, the Local TV Stations reconfirmed their agreement to pay

ASCAP at the $94.7 million level in 2009 by electing not to exercise their option to terminate their agreement at the end of 2008. Just recently, the Local TV Stations agreed with ASCAP to continue the agreement for 2010 on an interim basis. Second, a 2006 award rendered by a panel of distinguished arbitrators set the SESAC annual blanket license fee for Local TV Stations at $19.3 million for 2007. Proportionately, based on BMI's share of music used by Local TV Stations compared to ASCAP and SESAC, these license fee levels suggest a reasonable BMI annual fee in excess of $100 million per year.

12. The Petition also fails to note the Local TV Stations' increasing revenues from "retransmission consent" payments made to them by cable system operators under the Communications Act. This source of revenue has increased markedly in recent years and is expected to continue growing in the near future.

13. Further, the intensity of Local TV Stations' music usage in their broadcast programming and, in particular, their reliance upon BMI-repertoire music have increased since 2004. One of the most important trends in television programming in recent years has been the revival of the variety show format, with an emphasis on feature musical performances. For the past several years, for instance, the most highly-rated broadcast television series, which is carried on the Fox Television Network, has been "American Idol," whose format focuses on live feature performances of popular songs, including many BMI songs. Similarly, another highly-rated broadcast television series, also carried on the Fox Television Network, has been "So You Think You Can Dance," a live dance program, where popular songs – including BMI works – are featured.

14. Another way the Local TV Stations have increased their use of BMI music since 2004 is through their associated Internet, wireless and digital transmissions. There are

now over 1,000 Local TV Stations broadcasting via a website. The Petition requests a BMI license with an expanded scope of rights as compared to the 1999 License.[5] The request to expand the scope of the license to include Internet broadcasts or transmissions, including video-on-demand broadcasts, streaming on websites, and delivery via mobile, wireless and other digital platforms, has resulted, and will result, in a substantial increase in music usage under the license. This request apparently includes not only the right to transmit performances of music from the Local TV Stations' own websites but to transmit on a through-to-the-viewer basis by means of websites and other digital platforms operated by third parties. The Petition does not specify the mobile, wireless and other digital platforms for which it seeks a license, nor the specific types of programming or means by which the Local TV Stations would access those platforms. BMI reserves its rights on that subject, including whether it is appropriate for Petitioners, rather than the owners of those platforms, to obtain performing rights licenses.

15.     Additionally, most, if not all, of the Local Stations multicast their signals now that they broadcast by means of HDTV and/or digital broadcasting. There are currently over 775 new digital Local TV Stations. Just a few years ago, a Local TV Station could only broadcast a single schedule of programming on its assigned FCC channel. Now, however, multicasting allows that Local TV Station to offer several channels of digital programming at the same time. So, for example, in 2004 a Local TV Station that broadcast on Channel 4 was only able to offer viewers one program at a time, but today that same Local TV Station broadcasting in digital on Channel 4 can offer its viewers one digital program on Channel 4-1, a second – and completely different – program on Channel 4-2, a third digital program on

---

5. The 1999 License granted the Local TV Stations the non-exclusive right to publicly perform by means of a television broadcast and as part of a single website owned or controlled by a licensed station.

7

Channel 4-3, and so on. This means more programming choices broadcast on multiple channels rather than a single channel, which also increases the number of BMI music performances. Digital broadcasting and HDTV create a higher quality audience experience, increasing the value of the BMI license to the Local TV Stations.

16. Lastly, even merely adjusting for inflation alone entitles BMI to a significant increase in license fees.

17. Thus, BMI expects the evidence to show that, the reasonable license fee for the Local TV Stations to pay to BMI should be considerably higher than the level paid for 2004.

18. An important additional issue to be determined in this proceeding is whether there should be a new and different formula for allocating industry-wide fees among the Local TV Stations, and who should be responsible for administering it.

## *The Per Program License*

19. BMI expects the evidence to show that the per program license under which the Local TV Stations have been operating on an interim basis is reasonably available to them, and that savings from BMI fees under the per program license have resulted in net BMI collections from the industry that are considerably lower than the blanket fee level. In fact, the per program license is underpriced and not, as the Local TV Stations claim, "unreasonably expensive" relative to the blanket license. As the Local TV Stations concede, hundreds of stations have been operating under the per program license, resulting in a "lowering of net fees paid" by them to BMI, and the per program license continues to offer the Local TV Stations a practical alternative to the blanket license.

20. However, BMI asks that the per program license be adjusted by the Court to eliminate certain anomalies in the 1999 License. One is the inadequate and unfair treatment of "split works" (that is, works having multiple authors, at least one of whom is affiliated with BMI and others of whom are affiliated with ASCAP or SESAC). Under the 1999 per program license, a station can rely on an ASCAP blanket license to clear *all* the rights in a split work, including the interest of the BMI-affiliated author, even though the station does not pay BMI for the performance under the BMI per program license and the BMI-affiliated author is not compensated for his interest in the performance by anyone.

21. Another adjustment in the per program license concerns Fox and other networks that do not hold BMI network licenses. When the affiliate (or wholly-owned) station of such a network holds a BMI per program license, the substantial national advertising revenues earned by the network from its programming have not been taken into account by that station when it has calculated its monthly fees payable under the 1999 License. Therefore, fees paid under that per program license did not fairly value the BMI music included in programming on such a network's affiliate station selecting that license.

22. In light of the Local TV Stations' entitlement to a per program license, it also remains a question as to whether they are also entitled to an adjustable fee blanket license as they have requested, rather than the traditional blanket license.

### Access to the BMI Data Base

23. Finally, BMI opposes the Local TV Stations' demand for "access to information about the presence of BMI repertory music in programming broadcast on local television that is maintained by BMI in the ordinary course of its business but currently withheld from [the Local TV Stations], their agents, and their representatives." BMI is under

9

no obligation under the Consent Decree or otherwise to provide the Local TV Stations with access to its database of music cue sheets. This is proprietary information, collected over many years and kept current on a daily basis by BMI at great expense. The Local TV Stations have their own sources of cue sheets and have access to vendors, including the per-program license administrator used by the TMLC, Music Reports, Inc. ("MRI"), from which they can obtain similar data.

## Conclusion

Accordingly, BMI requests that the Court:

(a) determine that the rates and other terms that BMI will propose for a blanket license for the Local TV Stations for the years 2005 through 2014 are reasonable and order the Local TV Stations to pay them, retroactively to January 1, 2005, with interest;

(b) determine that BMI's proposed rates and other terms for a per program license for the Local TV Stations for the years 2005 through 2014 are reasonable and order the Local TV Stations to pay them, retroactively to January 1, 2005, with interest;

(c) deny the Local TV Stations' request for mandatory access to BMI's proprietary music cue sheet database; and

  (d)  grant BMI such other and further relief as this Court may deem just and proper.

Dated: New York, New York
    February 24, 2010

                Respectfully submitted,

                HUGHES HUBBARD & REED LLP

By: _/s/ Michael E. Salzman_
    Michael E. Salzman
    James C. Fitzpatrick
    Margaret J. Hoag
One Battery Park Plaza
New York, NY  10004
(212) 837-6000
salzman@hugheshubbard.com
fitzpat@hugheshubbard.com
hoag@hugheshubbard.com

      -and-

Marvin L. Berenson
Joseph J. DiMona
John Coletta
Hope M. Lloyd
320 West 57th Street
New York, New York  10019
(212) 586-2000

*Attorneys for Broadcast Music, Inc.*