```
                                          USDC SDNY
                                          DOCUMENT
                                          ELECTRONICALLY FILED
UNITED STATES DISTRICT COURT              DOC #:_____
SOUTHERN DISTRICT OF NEW YORK
                                          DATE FILED: 4-28-11
-----------------------------------X
WPIX, INC., et al.,                :
                                          09 Civ. 10366 (LLS)
                    Applicants,    :

          -against-                :      **OPINION AND ORDER**

BROADCAST MUSIC, INC.              :

                    Respondent.    :
-----------------------------------X
```

The question on Broadcast Music, Inc.'s ("BMI") motion is whether the Decree under which it operates requires it to offer to broadcasters the "carve-out" license which U.S. v. Broadcast Music, Inc. (Application of Muzak LLC and AEI Music Network, Inc.) 275 F.3d 168 (2d Cir. 2001) ("AEI") held BMI must offer to non-broadcasters. The "carve-out" license is a blanket license providing access to BMI's whole repertory of musical works for the whole period of the license, but with a special pricing mechanism which reduces the fee the licensee pays to BMI based on the proportion of the licensee's performances of BMI music for which he has obtained an alternate license for which he is paying the composer or publisher directly.

BMI argues that it has no obligation to offer broadcasters a "carve-out" license, and that

> The AEI decision is inapplicable to this case. AEI involved applications by non-broadcasters, and required construction of the BMI Decree's provisions affecting non-broadcasters. . . . the BMI Decree has specific provisions affecting broadcasters that clearly preclude a finding that BMI must provide the form of license that the Local Television Broadcasters are seeking.

(BMI Feb. 15, 2011 Mem. ("BMI br.") 20.)

Background

The background of the dispute is set forth in the AEI Opinion, 275 F.3d at 171-72:

> BMI is one of the largest performing rights organizations in the country. It grants licenses to music users, collects license fees from them, and distributes the royalties among its affiliated copyright holders ("Affiliates"). Its Affiliates comprise approximately 250,000 songwriters, composers, and publishers, and its catalog includes about three million musical works. Applicants Muzak LLC and AEI Music Network, Inc. provide music environments, often referred to as "background music services," to various commercial clients such as restaurants, retailers, department stores, offices, and supermarkets. The services are provided either by delivery of discs or tapes to the clients, or by satellite transmission.
>
> In 1941, the United States brought separate antitrust suits against BMI and its main competitor, the American Society of Composers, Authors and Publishers ("ASCAP"), for unlawfully monopolizing the licensing of performing rights. Both suits were settled by consent decree. United States v. Broadcast Music, Inc., 1940-43 Trade Cas. (CCH) ¶ 56, 096, 381 (E.D. Wisc. 1941); United States v. Am. Soc'y of Composers, Authors, and Publ'rs ("ASCAP"), 1940-43 Trade Cas. (CCH) ¶ 56,104, 402 (S.D.N.Y. 1941) amended, 1950-53 Trade Cas. (CCH) ¶ 62,595, 63,750 (S.D.N.Y. 1950) ("ASCAP Decree"). In 1950, the ASCAP consent decree was amended to establish a "rate court" mechanism, which enabled the court to set fees for licenses when license applicants and ASCAP could not come to agreement. United States v. ASCAP, 1950-53 Trade Cas. (CCH) ¶ 62, 595, 63, 750 (S.D.N.Y. 1950) The government brought the instant suit against BMI in 1964, and the parties entered into a consent decree two years later. United States v. Broadcast Music, Inc., 1966 Trade Cas. (CCH) ¶ 71, 941, 83, 323 (S.D.N.Y. 1966), amended, No. 64-CV-3787, 1994 WL 901652, at *1 (S.D.N.Y. Nov. 18, 1994) (1996-1 Trade Cas. (CCH) ¶ 71, 378) ("BMI Decree" or "decree").
>
> The BMI Decree places a number of specific restrictions on BMI. Among other things, the decree prohibits BMI from itself publishing, recording or

2

>  distributing music commercially (Section IV(B)), from refusing to contract with a potential affiliate (Section V(A)), and from discriminating between similarly-situated licensees (Section VIII).
>
>  The decree specifically requires that BMI grant certain types of licenses. Section VIII(B) requires that BMI license to any broadcaster "the rights publicly to perform its repertory by broadcasting on either a per program or per programming period basis, at [BMI's] option" ("per program license"). Section IX(C) prohibits BMI from refusing to license to "music users other than broadcasters," such as Applicants, a license "at a price or prices to be fixed by [BMI] with the consent of the copyright proprietor for the performance of such specific (i.e., per piece) musical compositions, the use of which shall be requested by the prospective licensee" ("per piece license"). In addition, Section IV(A) prohibits BMI from preventing writers or publishers of a composition from directly licensing their work to a music user.
>
>  Traditionally, the BMI's license of choice has been a "blanket license," a license that grants the licensee access to BMI's entire repertory in exchange for an annual fee. In Applicants' case, that fee has always been based on the number of licensee's locations that use BMI-licensed works, i.e., on a "per premise" basis. The BMI Decree does not specifically mention the blanket license; however, BMI has historically offered it and Applicants have recently held blanket licenses.

(alterations in original.)

The AEI Holding

As the Second Circuit held in AEI, id. at 171:

> We conclude that Applicants' request for a blanket license subject to "carve-outs" constitutes a request not for a new type of license, but for a blanket license with a different fee basis, over which the district court has rate-setting authority and which BMI must offer.

In pointing out that the addition of Section XIV in 1964 established the rate court and added the new provision that an applicant for "the right of public performance of any, some or all

3

of the compositions in [BMI's] repertory" must be offered a fee BMI deemed reasonable, with application to this rate court if parties could not agree, id. at 173, the Court of Appeals drew no distinction between applicants who are broadcasters and others. It had "no trouble concluding that Section XIV(A) requires BMI, upon request for a blanket license, to quote a fee it deems reasonable for that license, and that Section XIV(A) empowers the district court to set a reasonable fee if the parties cannot come to agreement," id. at 176, again with no distinction between broadcasters and other applicants.

The Court of Appeals viewed the "carve-out" structure not as an alteration of the legal rights of the parties, but simply as a mechanism whereby "Applicants would be gaining use of part of the repertory either by paying BMI a per piece license fee, or by paying a fee to the copyright holder. The only modification . . . to the traditional blanket license is in the way the fee is calculated." Id. at 176. Thus, the Court concluded, again without distinctions between broadcasters or non-broadcasters (id. at 177):

> Therefore, we construe Section XIV to require that when an applicant may obtain alternative licensing under the BMI Decree, and the applicant requests a blanket license with a fee structure that reflects such alternative licensing, BMI must advise the applicant of the fee it deems reasonable for such a license. Failure to do so will empower the district court to set a reasonable fee.

Since the "carve-out" license represents merely a different fee calculation in a traditional blanket license,

> . . . we need not address Appellants' argument that the "any, some, or all" language in Section XIV requires BMI to quote a fee for, and offer, any type of license an applicant might request. We are presented in this appeal with requests for two types of licenses: the blanket license, which BMI has stated it will always want to offer, and the per piece license, which is explicitly required in Section IX(C). The question of whether or not the provision requires BMI to offer some other form of license, should one be requested, is not necessary to the resolution of the issues on appeal and we leave it for another day.

Id. at 178 n.2.

### This Application

Essentially, BMI's argument that it is not required to offer the "carve-out" license to broadcasters is that

> In AEI, non-broadcasters claimed to have no ability to take advantage of direct licensing in the absence of the composition-by-composition crediting system that they were seeking. But those non-broadcasters had no access to the per program license to which only broadcasters have mandatory access under Section VIII(B). Accordingly, unlike the broadcaster Applicants in this case, the non-broadcasters in AEI successfully contended that they had no effective means to take advantage of direct licensing in the absence of the composition-by-composition crediting system that they were seeking. Id. at 173.
>
> But here, the BMI Decree expressly affords broadcasters a means of obtaining the benefits of direct licensing through the use of the per program license.

\* \* \*

> In AEI, as non-broadcasters, the applicants could argue that, <u>because they had the right to license any one or more composition, up to the entire BMI repertoire</u> with per piece licenses, (BMI Decree § IX(C)), they should be allowed to get a license to the entire repertoire, and a credit for any one or more pieces that they license directly. Thus, the background music

> service applicants had available to them the argument that because they had the right to license through BMI one, two or 100 compositions, they should also be able to license the entire BMI repertoire with a credit for those one, two or 100 separately-licensed compositions. Whether or not such an argument was persuasive, the Local Television Broadcasters can make no such argument here.

(BMI br. at 22-23, emphasis in original.)

BMI also argues that Section VIII(B) of the Decree gives BMI, rather than a broadcaster, the right to decide whether to offer broadcasters any licenses other than the required per program or programming period licenses. (Id. 2.) BMI argues,

> Section VIII(B) gives BMI the sole right to decide, providing that "[i]n the event [BMI] offers to license broadcasters on bases in addition to a per program or per programming period basis," BMI must act in good faith to ensure that there is an appropriate relationship between the per program fee and the alternative fee structure offered. (BMI Decree § VIII(B) (emphasis added).) BMI is simply not required to provide broadcasters the composition-by-composition crediting feature they seek.

Ibid. (emphasis, brackets and parenthesis BMI's). See also id. at p. 12:

> By including the following language--"[i]n the event [BMI] offers to license broadcasters on bases in addition to a per program or per programming period basis (emphasis added)--the BMI Decree clearly manifests the parties' intention that it was BMI's option to offer a license on any other basis than the traditional blanket license, per program license or per programming period license.

(emphasis, brackets and parenthesis BMI's).

* * *

Whatever merit these arguments might hold if the case involved requiring the offer of a new form of license, they do not apply

here, for that is not the issue. These applicants are not seeking a new form of license. The specific provisions on which BMI relies, particular to broadcasters and others, do not affect the blanket license which has traditionally been offered to all applicants. That is what these applicants seek. In rendering its decision in AEI, the Court of Appeals was fully aware of the interplay between those provisions. 275 F.3d at 172. Its decision did not rest upon the interrelationship between them. Rather, it decided that what was sought was a mere readjustment to the fundamental blanket license and thus was required to be made available without regard to the per-piece or per-program options. Like an argument made under Shenandoah[1] to the AEI Court, 275 F.3d at 177:

> . . . whatever relevance [those arguments] might have to requests for new types of licenses, it does not compel the same outcome here since Applicants have requested a blanket license with a revised fee structure.

Thus, the "carve-out" blanket license, being no more than the traditional and common blanket license despite its particular pricing mechanism, is required by long tradition and by Section XIV of the Decree to be issued to any applicant, without regard to whether the applicant is a broadcaster or non-broadcaster.

---

[1] United States v. ASCAP (Application of Shenandoah Valley Broadcasting, Inc.), 331 F.2d 117 (2d Cir. 1964)

Conclusion

Accordingly, BMI's February 15, 2011 "Motion For An Order That The BMI Consent Decree Does Not Require BMI To Provide To Broadcasters Another Blanket License With An Adjustable Credit" (Dkt No. 23) is denied.

So ordered.

DATED:   New York, New York
         April 27, 2011

                                        _____
                                          LOUIS L. STANTON
                                            U. S. D. J.